THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT T. PERRY, Defendant-Appellant.

(No. 52932;

First District—March 15, 1971.

Wallace, Shelton, Kleinman, Belline, Kalcheim & Curoe, of Chicago, (John J. Wallace, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer Kissane and James A. Veldman, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

On June 2, 1967, two petitions were filed in the Juvenile Division of the Circuit Court of Cook County against Robert T. Perry, a minor. These petitions charged Perry with delinquency in that he committed the offense of aggravated assault upon one Michael Dunn and the offense of aggravated battery upon one Joyce Wilson. After an adjudicatory hearing, Perry was adjudged delinquent and a ward of the court. He was subsequently committed to the Illinois Youth Commission.

On appeal, Perry contends that: (1) the lower court erred by allowing the State to prove its case with a preponderance of the evidence rather than beyond a reasonable doubt; (2) the pre-trial identification by Linda Mason, a State's witness, was improper and prejudicial; (3) the lower court erred by refusing to consider polygraph evidence at the dispositional hearing; and (4) the dispositional hearing was improperly conducted.

At the adjudicatory hearing, Joyce Wilson, age 15, testified that she and Linda Mason were returning from a neighborhood bowling alley about 10:30 P.M., May 28, 1967, when they passed an alley near 82nd and South Park Avenue, in Chicago. Two boys were standing in the alley and as the girls passed, a gun went off and Miss Wilson was shot in the upper right shoulder. Miss Wilson fell to the ground and her girl friend "stood in the alley calling the accused's name." Miss Wilson did not recognize the person who shot at her. She was later confined in the St. George Hospital and testified that while she was in the hospital the police brought Robert Perry and his father into her room.

Linda Mason testified that she saw Robert Perry standing in the lip of the alley as she and Joyce Wilson were passing. She knew Robert Perry on sight and had seen him many times before. Perry was standing about three yards from her when she recognized him. She had seen him in the bowling alley earlier that evening. The girls passed Perry and when they were about three-fourths of the distance across the alley, shots came from the alley and Joyce Wilson was shot. After the shots, Miss Mason looked in the alley, which was well lighted, and "saw Robert Perry and another boy running down the alley." She then took Miss Wilson home and the police were called. When the police arrived, she informed them that it was a boy by the name of Perry who had fired the shot. She did not know Perry's first name at this time. Sometime later, she went to the police station and identified Perry.

Joyce Wilson was recalled and testified that she had been acquainted with Robert Perry and had never had any trouble with him.

The State then rested its case and the respondent moved for a directed

verdict, asserting that the State had not preponderated in its case. The motion was denied and the respondent proceeded to call his witnesses.

Charles Knox, a neighbor of the respondent, testified that he looked out his front window about 10:15 P.M., May 28, 1967, and saw the respondent entering his house at that time. He also testified that Perry was a good boy and had never been involved in any trouble.

Tanner T. Perry, the respondent's father, testified that he had arrived home about 10:09 P.M. on May 28, 1967, and his son, Robert, came home about two minutes later. Mr. Perry indicated that his son did not leave the house after that except to take his dog into the yard.

Eunice Perry, the respondent's mother, testified that she had been at her sister's home on 73rd Street on the night in question. Her husband picked her up just after the 8:00 P.M. movie on television had ended and they went directly home, arriving there about 10:05 or 10:10 P.M. Her son, Robert, came home about two minutes later and left the house only to take his dog into the yard.

Dwight Franklin testified that he and the respondent had been together most of the day and were at Perry's house from 7:00 to 9:30 P.M. on the night in question. The two boys then went to a friend's house and later went to the bowling alley. Franklin stated that they left the bowling alley about 10:00 P.M., walked to the corner of 81st and South Park and separated. The witness did not see Perry enter his house although he testified that Perry had expressed an intention to go right home after they parted company.

Robert Perry, testifying on his own behalf, stated that he and Dwight Franklin visited a friend about 9:35 P.M. on the night of May 28th and left for the bowling alley about 9:50 P.M. He saw Joyce Wilson and Linda Mason there but did not converse with them. He stated that he and Franklin left the bowling alley about four minutes later and walked to the corner of 81st and South Park where they briefly chatted and then parted company. Perry indicated that he went directly home, let his dog out for a short time and then went to bed. He denied having participated in the incident involving the shooting of Joyce Wilson.

The State called Michael Dunn as a rebuttal witness.

Mr. Dunn testified that he was on the corner of 81st and Calumet about 10:30 P.M. on the night in question. At that time he saw Robert Perry standing about five feet from him. Perry had been standing across the street from Dunn and was with another boy. Perry crossed the street, came up to Dunn and said something about money. Suddenly a gun went off and, according to Dunn, "it was directly in front of me. He was standing a little to the left and I saw the flash and everything. Right

then I didn't realize it was even in his hand until it went off * * *. I looked at him and I sort of got myself together and then I ran across the street."

After the testimony of Albert Leak, a character witness for the respondent, the court found for the State and adjudicated the respondent a delinquent. The cause was then set for a dispositional hearing.

At the dispositional hearing, respondent's counsel sought to introduce evidence concerning a polygraph examination to which the respondent had voluntarily submitted. This examination had apparently been made shortly after the adjudicatory hearing had been concluded. The State's objection to the introduction of such evidence was sustained and respondent's counsel then made the following offer of proof:

"* * * if a Mr. Robert J. Abson of John Reed and Associates were to testify here in court, or if his report bearing his signature was accepted in court it would show that there were four questions placed to the accused. First one being, 'On May 27, which is the date of the incident, 1967, at or about 11:00 P.M. were you at Eighty-Second at Calumet?' His answer was 'No.' The second question was 'On May 27, 1967, did you shoot Joyce Wilson?' Answer, 'No.' Third question, 'Were you at home when Joyce Wilson was shot?' Answer, 'Yes.' Fourth Question, 'Did you shoot a revolver on the night of May 27, 1967?' Answer, 'No'—and further, if Mr. Abson * * * were asked his opinion or if the report were accepted into evidence it would indicate that the opinion of the examiner, based upon the Polygraph Exams, was that this boy was telling the truth on all four questions."

The State, after objecting to the respondent's offer of proof, then offered in aggravation the testimony of Michael Dunn, who was present in court, and made the following offer of proof:

"[I]f Michael Dunn were called to testify and his testimony is in evidence he will [sic] testify, on the night in question at about ten-thirty that evening he was assaulted by means of gunshot by Robert Perry. His testimony is in the record and the State can call him. This occurred on the same evening as the other allegation, the other shooting. This we offer in aggravation."

Respondent's counsel did not object to the State's offer of proof, but asked leave to "ask Michael Dunn some questions." Permission was granted and the following dialogue ensued:

"Q. Mr. Dunn, you testified before this Court on July 10th [adjudicatory hearing], is that right?

A. Yes.

Q. At that time, you identified Robert Curry [sic] as the boy who

approached you in the Eighty-One Hundred Block of Calumet, is that correct?

A. Yes.

Q. Do you persist, now, in your identification, a positive identification of Robert Perry as that boy who approached you that night?

A. Yes."

A report from the Probation Officer assigned to the case indicated that the respondent had no prior contacts with the juvenile authorities, came from a wholesome family and was doing well in school.

The court then heard further evidence in mitigation from the respondent's father and, after asking Witness Dunn a few additional questions, committed the respondent to the Illinois Youth Commission. A subsequent motion for a new trial, i.e., adjudicatory hearing, was denied and this appeal was then perfected.

Respondent's first point concerns the standard of proof necessary to support an adjudication of delinquency in a juvenile proceeding. Respondent was adjudicated delinquent by a preponderance of the evidence and he contends that the required standard was that of beyond a reasonable doubt.

Initially, we note that Ill. Rev. Stat. 1965, ch. 37, pars. 701—4, 704—6, The Juvenile Court Act, were in effect at the time of respondent's adjudicatory hearing on July 10, 1967. Those statutory sections provided as follows:

"701—4. § 1—4. Adjudicatory hearing. 'Adjudicatory hearing' means a hearing to determine whether the allegations of a petition * * * are supported by a preponderance of the evidence * * *.

704—6. § 4—6. Evidence at Adjudicatory Hearing. At the adjudicatory hearing, the court shall first consider only the question whether the minor is a [delinquent minor] * * *. No finding may be made that the minor is a [delinquent minor] unless supported by a preponderance of the evidence * * *."

While these statutes would at first blush appear to easily resolve respondent's first contention, such is not the case in view of *People v. Urbasek*, 38 Ill.2d 535, 232 N.E.2d 716, which was filed on November 30, 1967. In *Urbasek*, the Illinois Supreme Court held that a finding of delinquency for misconduct, which would be criminal if charged against an adult, is valid only when the acts of delinquency are proved beyond a reasonable doubt to have been committed by the juvenile charged. In so holding, the Court also expressly voided Sections 701—4 and 704—6 of the Juvenile Court Act. The Court's rationale was largely based upon the spirit and intent of *In re Gault* (1967), 387 U.S. 1, wherein the U.S.

Supreme Court held that the essentials of due process require that a juvenile court adjudication of delinquency include advance notice of the charges, the right to counsel, the privilege against self-incrimination and the right to confrontation and cross-examination of witnesses. Referring to *Gault*, the Illinois Supreme Court said:

"We believe * * * that the language of that opinion exhibits a spirit that transcends the specific issues there involved, and that, in view thereof, it would not be consonant with due process or equal protection to grant allegedly delinquent juveniles the same procedural rights that protect adults charged with crimes, while depriving these rights of their full efficacy by allowing a finding of delinquency upon a lesser standard of proof than that required to sustain a criminal conviction * * * [W]e cannot say that it is constitutionally permissible to deprive the minor of the benefit of the standard of proof distilled by centuries of experience as a safeguard for adults." 38 Ill.2d 541-2.

Although the *Urbasek* decision does not unequivocally rest on a constitutional basis, the United States Supreme Court in *In re Winship* (1970), 397 U.S. 358, expressly held that the use of the reasonable doubt standard in the adjudicatory stage of a delinquency proceeding, when a juvenile is charged with an act that would constitute a crime if committed by an adult, is a due process requirement.

In view of these decisions, therefore, we are ultimately faced in the instant case with the difficult task of determining whether the newly enunciated rule is to be given retroactive effect, and thus require that we reverse this judgment or whether it is to be applied prospectively only. We are mindful, in this regard, that although the new doctrine is of constitutional magnitude, the Constitution itself neither prohibits nor requires retrospective effect, and a court must make such a determination by weighing the particular merits and demerits of each case. (*Linkletter v. Walker* (1965), 381 U.S. 618. See also, *Johnson v. New Jersey* (1966), 384 U.S. 719; *Tehan v. United States* (1966), 382 U.S. 406, *reh. denied,* 383 U.S. 931 (1966); *People v. Adams* (1970), 46 Ill.2d 200, 263 N.E.2d 490.) The extent to which the new doctrine is to be applied should depend, in the language of Mr. Justice Cardozo, upon "considerations of convenience, of utility, and of the deepest sentiments of justice." Cardozo, The Nature of the Judicial Process, 148-9 (1921).

At stake here is one of the most important principles of constitutional interpretation. The Federal Constitution, and especially the Bill of Rights, including the Fourteenth Amendment, is not a rigid aggregation of fundamental rules but a dynamic and flexible document, to be inter-

preted from time to time to conform to the social and economic needs of a changing society in a modern world. As old reliances falter under modern pressures and as new problems spring forth, the judicial process has traditionally been flexible enough to respond to the need for expanded concepts of justice. It is quite apparent that both the highest courts of this State and of this land have recognized a new need in the area of juvenile delinquency proceedings and those courts have responded by expanding the due process of law concept to include the right of a juvenile to be adjudicated delinquent by the standard of beyond a reasonable doubt, at least where the offense charged against the juvenile would be a criminal charge if made against an adult.

As indicated by Mr. Justice Fortas in the *Gault* decision, the Juvenile Court movement began in this country at the end of the last century with Illinois passing the first juvenile court statute in 1899. The innovators of the juvenile system were moved by "the highest motives and most enlightened impulses" and a truly *ex parte* procedure was established, with the child's welfare and best interests at the heart of it. As suggested in *Gault* and in *Kent v. United States* (1966), 383 U.S. 541, however, the results have not been entirely satisfactory. Rather than remaining an *ex parte* proceeding, the adjudication of delinquency has substantially become adversary in practice. The reasons for this unfortunate development are, no doubt, numerous but we need not speculate as to such matters. The fact is that juvenile adjudicatory proceedings *have become* substantially adversary in nature, and in view of this development, the decisions of *Gault*, *Urbasek* and *Winship* became necessary in the interests of fundamental justice and fairness. These decisions recognized for the first time that certain judicial action was necessary to remedy the ills which had developed in the juvenile process. Whether the needs which occasioned these decisions pre-existed their rendition we cannot say. We can only say that the needs were recognized by the courts as of the time of judicial decision. The decline of the *ex parte* nature of juvenile proceedings was an historical process which began in 1899 and ended, to large extent, with the rendition of *Gault*, *Urbasek* and *Winship*. In these decisions, for the first time, the expanded rights of juveniles in adjudicatory proceedings were enunciated. Such rights are grounded in due process of law and find no explicit expression in the constitutions of this State or of the United States. As we have suggested, we believe that the enunciation of these rights was a response to the new need for fairness which had developed because of the substantial changes in the nature of juvenile adjudicatory proceedings. In particular, we believe that on November 30, 1967, the need for a revised standard

of proof in juvenile adjudicatory proceedings had become so substantial that the Supreme Court of Illinois reacted by holding as it did in the *Urbasek* case.

■■ Some may challenge the precision with which this court has drawn its conclusion in this regard. It is true that we have specified a certain date, November 30, 1967, as the time at which the juvenile's need for a revised standard of proof became so substantial that fundamental fairness and justice required appropriate judicial response. We have done so because the line must be drawn at some point in time and we find no "most compelling circumstances" which require that an earlier date be selected. (See *United States v. Fay* (2d Cir. 1964), 333 F.2d 12, *aff'd, Angelet v. Fay* (1965), 381 U.S. 654.) Accordingly, we believe that the decision of *People v. Urbasek*, which provided that the reasonable doubt standard of proof must be applied in juvenile adjudicatory proceedings and which invalidated Sections 701—4 and 704—6 of the Juvenile Court Act, is to be given prospective effect only. We find no evidence that the Illinois Supreme Court intended otherwise.

In thus deciding, we are also mindful of certain general policy considerations which make it generally undesirable to give retroactive effect to *Urbasek*. It has for generations been part of the formulary of *stare decisis* and *res judicata* to leave the history of the past undisturbed and to sustain the finality of judgments long since recorded. This is due in no small measure to the fact that witnesses die, documentary and other proofs are destroyed or otherwise become unavailable, and the retroactive application of overruling decisions involves of necessity an unequal and discriminatory result in individual cases. (See *United States v. Fay* (2d Cir. 1964), 333 F.2d 12, 21, *aff'd, Angelet v. Fay* (1965), 381 U.S. 654.) Added to this is the fact that those engaged in the juvenile process prior to *Urbasek* placed great reliance on the preponderance standard, as they were legally bound to do, and retroactive application of the *Urbasek* holding would thus seriously burden judicial administration in the juvenile sector. An already overburden Juvenile Court would be required to conduct new adjudicatory hearings for all those committed to the Illinois Youth Commission or, indeed, merely adjudicated delinquent, prior to November 30, 1967. This would certainly disrupt the due administration of justice and seriously disturb the integrity of the judicial process. We are not inclined to create such chaos through decision in this particular case, and no compelling reasons require us to do so. It was the judgment of the court in *Urbasek* that changed the rule here involved and the date of that opinion is the crucial date. Considering all factors involved, we believe that to be the better cutoff time.

(See *Linkletter v. Walker* (1965), 381 U.S. 618.) The respondent was, therefore, adjudicated a delinquent properly and in accordance with the then operative law.

■■  Respondent's second contention concerns the validity of the pretrial identification by Linda Mason. The only evidence concerning this identification is found in the direct testimony of Miss Mason, wherein the following dialogue occurred:

"Q. So you never did identify Robert after this incident?
A. Oh, at the police station.
Q. For the police. You went to the police station?
A. (Nodding.)
Q. Did they bring Robert into a room where you were?
A. They just brought me to the doorway.
Q. And you then said that was the boy?
A. Yes."

No objection was made by the respondent or his counsel concerning this testimony and, under applicable law as indicated by *People v. Nelson* (1968), 40 Ill.2d 146, 238 N.E.2d 378, reversible error would occur only where a defendant so claiming proves that "the confrontation conducted * * * was so unnecessarily suggestive and conducive to mistaken identification that he was denied due process of law." Under the facts of this case, we can find no basis to support the respondent's contention. Miss Wilson knew the respondent before the incident occurred, saw him during the incident and gave his name to the police immediately after the incident. Under these circumstances, we do not believe that the identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the respondent due process of law.

Before passing on to respondent's third contention, we note that respondent's brief also refers to an identification in the hospital. Apparently, respondent is referring to the fact that he was brought by the police into Joyce Wilson's hospital room during her confinement after the shooting. However, she could make no identification and did not attempt to do so because she did not see her assailant at the time of the shooting. We also note that respondent relies on *United States v. Wade* (1967), 388 U.S. 218, and *Gilbert v. California* (1967), 388 U.S. 263. These cases are not applicable to the instant case, however, because their effect was prospective only. *Stovall v. Denno* (1967), 388 U.S. 293.

■■■  Respondent's third contention is totally devoid of merit. It is well established in this State that the results of polygraph examinations cannot properly be introduced as evidence of either guilt or innocence of an accused. (*People v. Nicholls* (1969), 42 Ill.2d 91, 245 N.E.2d 771,

*cert. denied,* 396 U.S. 1016 (1970); *People v. Nelson* (1965), 33 Ill.2d 48, 210 N.E.2d 212, *cert. denied,* 383 U.S. 918 (1966). Moreover, the offer of proof concerning the polygraph examination was made after the adjudicatory hearing had been concluded. We believe that presentation of such evidence, even if admissible, would have no place in a dispositional hearing. We note also that the questions allegedly asked by the polygraph examiner referred to a date (May 27, 1967) other than the one upon which the shooting incident occurred (May 28, 1967.)

■■ Respondent's final contention seems to be that the lower court erred by considering the testimony of Michael Dunn during the dispositional hearing. Respondent cites, in support of his claim, Ill. Rev. Stat., ch. 38, par. 1—7(g), which concerns the conduct of a hearing in mitigation and aggravation under the Criminal Code. We do not reach the merits of his claim under this statute, however, because his reliance is misplaced. The respondent here was not tried under the provisions of the Criminal Code. He was adjudicated a delinquent pursuant to provisions of the Juvenile Court Act, which is contained in ch. 37, Ill. Rev. Stat. The respondent had no hearing in mitigation and aggravation. He had a dispositional hearing as provided by Ill. Rev. Stat. 1965, ch. 37, par. 705—1, which states in part:

"§705—1. Dispositional Hearing; Evidence; Continuance

(1) After adjudging the minor a ward of the court, the court shall hear evidence on the question of the proper disposition best serving the interests of the minor and the public. *All evidence helpful in determining this question,* including oral and written reports, *may be admitted and may be relied upon* to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." (Emphasis added.)

This statute expressly gives the juvenile court judge a great deal of discretion regarding the conduct of a dispositional hearing. This is as it should be. Under the stated facts of this case, we can find no evidence that the lower court abused its discretion to any degree even approaching prejudicial, reversible error.

Accordingly, for the reasons which we have stated, the judgment is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.